IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRENDA HUNDLEY, Guardian of
AMY MARIE HUNDLEY,

               Plaintiff,

v.                                                             Case No. 19-2366-JWB

EMPLOYEE BENEFIT PLAN OF THE
COMPASS GROUP, INC.,

               Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on the parties' cross motions for summary judgment, which have been fully briefed and are now ready for review.  This case involves a health insurance coverage dispute between Brenda Hundley ("Plaintiff"), in her capacity as guardian for her daughter, Ann Marie Hundley ("Hundley"), and the Employee Benefit Plan ("Defendant" or "the Plan") established by Hundley's employer, The Compass Group USA, Inc.  For the reasons stated herein, Plaintiff's motion for summary judgment (Doc. 14) is DENIED, and Defendant's motion for summary judgment (Doc. 22) is GRANTED.

### I. Facts

The parties agree that their dispute is governed by the federal Employee Retirement Income Security Act ("ERISA"),  29 U.S.C.§ 1132(a)(1)(B).  In an ERISA case, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."  *LaAsmar v. Phelps Dodge Corp. Life, Acc. Death & Dis. and Dep. Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citing *Bard v. Boston Shipping Ass'n*, 471 F.3d 229,

235 (1st Cir. 2006).  Consequently, the court recounts the following facts from the administrative record.[1]

Defendant Employee Benefit Plan is a self-funded medical benefits plan which provides medical and hospitalization coverage to employees of the Compass Group USA, Inc.  Defendant enlisted a commercial insurance company, United HealthCare Insurance Company ("United HealthCare"), to administer claims under the Plan.[2]  Pursuant to this arrangement, United HealthCare assumed fiduciary responsibility to construe the Plan's terms, perform fair and impartial review of all claims and appeals, and evaluate the validity of charges, as provided by ERISA, 29 U.S.C. § 1001 *et seq.*  Hundley, who was born in 1991, was a participant in the Plan when these events took place.

On June 18, 2017, Plaintiff found her daughter unconscious at her home.  Hundley was brought to the emergency room at Shawnee Mission Medical Center, and ultimately hospitalized there for ten days.  Hundley was severely emaciated, weighing only 55 pounds when she was admitted.  She was diagnosed with a severe and life-threatening eating disorder (anorexia nervosa), along with related serious medical problems, including, *inter alia*, severe anemia, malnutrition, elevated liver enzymes, depressed heart rate and hypoglycemia.  Her prior medical records showed that she had lost more than fifty percent of her body weight in the preceding two years.  Hundley was also diagnosed with depression and an anxiety disorder.  (Doc. 19-1 at 320-56.)  To complicate matters, hospital notes show that Hundley was resistant to treatment, believing that she had fainted

---

[1] References to the Administrative Record (AR pp. 1-1967) have been re-notated to reflect the CM/ECF docket numbers.

[2] This type of arrangement, where the roles of claims administrator and claims-payor are carried out by separate entities, is generally free from the risk (or taint) of conflicts of interest that the Supreme Court warned of in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  While Plaintiff mentions a potential conflict in her memorandum, she offers no evidence; consequently, the court refrains from further discussion of this issue.  *See Van Steen v. Life Ins. Co. of N.A.*, 878 F.3d 994, 997 (10th Cir. 2018).

due to a reaction to a laxative that she had taken, but that otherwise she was fine and she wanted to go home.  Because of her unwillingness to undergo treatment, a point of view characterized as "delusional" by hospital staff, Plaintiff sought and obtained emergency legal guardianship over Hundley in order to make medical decisions on her behalf.  Hundley was then placed on an involuntary hold, while Plaintiff and the hospital staff worked on a treatment plan.

Arrangements were made to transfer Hundley to the ACUTE Center for Eating Disorders in Denver, Colorado ("Denver Health").  This facility had a reputation for expertise in treating eating disorders and their ensuing medical complications.  Moreover, it was considered "in-network" and so presumably acceptable to United HealthCare.  Plaintiff arranged for an air ambulance, Angel MedFlight, to transport Hundley from Kansas to Denver on June 28, 2017.  When she was discharged from Shawnee Mission Medical Center that day, the discharge summary noted that Hundley was stabilized, although some complications persisted; her diet was described as "regular" and she was permitted to resume activities as tolerated.  (Doc. 19-5 at 138.)  Admitting records from Denver Health reflect that Hundley was admitted for "definitive medical stabilization of her extreme anorexia nervosa," and that, following stabilization, she would likely be transferred to a residential facility. (Doc. 19-7 at 6–13.)  Nothing in the records indicates that the transfer to Denver Health was recommended by the Shawnee Mission hospital staff.

Although Plaintiff asserts that it was not required, Angel MedFlight requested pre-approval for the transport service from United HealthCare.[3]  The request, faxed at 6:58 a.m. the morning of the scheduled flight, included Hundley's hospital records and a description of the medical treatment that she would require during the trip, including intravenous medication and monitoring.

---

[3] The Summary Plan Description urges members to call its member services department ahead of time to determine what services may be covered or denied, although exceptions may be made for emergency medical conditions that are "recent and severe."  All hospital stays must be pre-certified.  (Doc. 19-1 at 158.)

The request also included an itemized claim form showing the cost of the air ambulance transport: $236,300.00. (Doc. 19-1 at 398.) An hour after sending the fax, before hearing back from United HealthCare, Angel MedFlight went ahead with the trip. Hundley arrived safely in Colorado and was transported to Denver Health without incident. She was there for several weeks, and discharged on July 20, 2017.

Defendant's Summary Plan Description, which is distributed to all employees, indicates that among "Other covered services" is included "Professional ambulance service to or from the nearest hospital that is equipped to provide necessary treatment." (Doc. 19-1 at 164-65.) More detailed information is found in United HealthCare's "Coverage Determination Guideline 001.06," which provides for emergency ground, water or air transport but cautions that reference to "prior authorization and notification requirements" contained in "the member specific benefit plan document" is necessary, particularly in the case of self-funded plans. (Doc. 19-1 at 281-82.) These guidelines are not part of the Summary Plan Description; nor are they disseminated to participants. The guidelines further state that non-emergency air transport may be provided to "the closest Network Hospital or facility that provides Covered Health Services that were not available at the original Hospital or Facility," as long as "the patient's condition requires treatment at another facility." (Doc. 19-1 at 282.)

On July 3, 2017, United HealthCare denied coverage for Hundley's air ambulance transport. The denial noted that Denver Health was an "in-network" hospital, and acknowledged further that medically-necessary, non-emergency transport between facilities was covered "if certain criteria are met." (Doc. 19-1 at 400.) However, the denial letter continued: "The request for transport to Denver Health does not meet the plan's criteria because the services you needed were available in a facility closer to you."

Plaintiff, through Angel MedFlight's counsel, submitted an appeal in September 2017.  The appeal explained that Denver Health was a nationally-known facility with specialized experience in treating both the issues underlying the eating disorder and the medical problems resulting from malnutrition.  The appeal also outlined Hundley's condition at the time of the transfer, and the difficulties that would have been posed by transporting her by other means, such as commercial airplane or ground ambulance.  The medical director of Denver Health, Dr. Margherita Mascolo, contributed a Letter of Medical Necessity stating that, due to her facility's unique multidisciplinary expertise, there was no closer facility that could offer comparable care.  (Doc. 19-5 at 111–12.)  This appeal was denied in November 2017, after review by Dr. Gerilyn Metoyer, United HealthCare's medical director and specialist in internal medicine.  (Doc. 19-5 at 1–4.)  The denial reiterated the initial rationale,[4] and went on to specify:

> The University of Kansas Hospital and St. Luke's Hospital were closer facilities offering comprehensive treatment for the member's condition.  Therefore, the non-emergency air and ground ambulance transportation services from Shawnee Mission Medical Center in Kansas to Denver Health Acute Center for Eating Disorders in Colorado do not meet the Health Plans criteria for coverage of non-emergency ambulance transportation, were not medically necessary and not prior authorized and are not Covered Health Services under the Plan.

Plaintiff submitted a second appeal in December 2017.  The appeal noted that a review of the websites for the University of Kansas and St. Luke's hospitals failed to demonstrate that these facilities offered medical services for anorexia nervosa.  (Doc. 19-5 at 8–10.)  Plaintiff also retained psychiatrist Dr. Ashraf Ali to review Hundley's medical records and prepare an independent medical report to include with the appeal.  (Doc. 19-6 at 120.)  Dr. Ali recounted Hundley's condition while she was at Shawnee Mission Medical Center and noted that "it was felt in the patient's best interest to transfer her to a specialized facility."  Dr. Ali concluded that the air

---

[4] "There were other closer facilities that could have provided the treatment necessary to care for this member."

ambulance transport was medically necessary because Hundley needed "constant monitoring of

her cardiac and oxygenation status . . . ."

> Constant monitoring would not have been possible by ground and a commercial
> flight would not have been appropriate as it is not possible to constantly monitor
> the patient's condition in this type of flight.   Ground ambulance was also
> contraindicated under guidelines that recommend ground transportation be no more
> than 30-60 minutes in duration for a patient in her condition.   The distance from
> Shawnee Mission, Kansas to Denver, Colorado is more than 600 miles and would
> have taken more than 8 hours by ground.

This appeal was denied in January 2018, following review by United HealthCare medical director

Dr. Edward Greenberg.   Dr. Greenberg noted:

> Treatment for your acute malnutrition was already underway at the Shawnee
> Mission Medical Center and could have continued there.   Published information
> from The University of Kansas Hospital in Kansas City, Kansas shows that further
> treatment for anorexia nervosa was available and would have avoided the increased
> risk posed by air flight.

(Doc. 19-6 at 139–42.)

Plaintiff next sought an independent external review of her claim.   Plaintiff requested that

the review be conducted by a psychiatrist, because, as she maintained, that medical specialty would

have the best "understanding of the sequelae of the illness and the setting required for a successful

medical outcome."   (Doc. 19-6 at 148.)   In response, United HealthCare submitted the claim to

AllMed Healthcare Management.   In May 2018, the reviewing psychiatrist concluded:

> At the time of air transport, the patient was clinically stabilized after 10 days in the
> hospital.   The air ambulance transport was not preauthorized and was non-
> emergent.   The patient was awake, alert, conscious, and on oral medications and a
> regular diet.   She did not require oxygen or emergency treatment procedures during
> transport.   She did not have respiratory distress, cardiac distress, bleeding, or
> fracture.   She was not bed-confined before or after the air ambulance transport.
> Additionally, there were other closer facilities that could have provided the
> treatment necessary to care for this patient.

> The benefit plan covers medically necessary nonemergency ambulance services to
> and from the nearest medical facility qualified to give the required treatment when
> the member has obtained authorization prior to transport.   In this case, the

> University of Kansas Hospital and St. Luke's Hospital were closer facilities offering comprehensive treatment programs for the patient's condition. The patient's medical condition did not meet the industry standard of care regarding medical necessity for the air ambulance services. The decision to travel from Kansas to Colorado for treatment appears to have been an elective decision, not a medically necessary decision. Therefore, the non-emergency air ambulance transportation provided on 6/28/17 is not a covered health service based on the member's benefit plan.

(Doc. 19-10 at 14–19.) Plaintiff filed this lawsuit in July 2019, seeking benefits due under the plan, as well as interest, costs, and attorneys' fees. (Doc. 2.)

## II. Standard of review

Where, as here, an ERISA plan administrator has discretion to construe the plan and determine benefits eligibility, this court must uphold the administrator's decision unless it is arbitrary and capricious. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011); *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 380 n.4 (10th Cir. 1992). This standard limits the court's review to an assessment of whether the plan administrator's decision was "reasonable and made in good faith." *Eugene S.*, 663 F.3d at 1130; *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 929 (10th Cir. 2006). The court may not substitute its own judgment for that of the plan administrator "unless the administrator's actions are without any reasonable basis." *Geddes*, 469 F.3d at 929. In *Eugene S.*, the Tenth Circuit elaborated on the standard, writing:

> We will uphold the decision of the plan administrator so long as it is predicated on a reasoned basis, and there is no requirement that the basis relied upon be the only logical one or even the superlative one. We look for substantial evidence in the record to support the administrator's conclusion, meaning more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion.

663 F.3d 1134 (internal quotations and citations omitted); *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009). Notwithstanding the deference inherent in this standard of

review, the court must also consider that, while a plan administrator "has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807–8 (10th Cir. 2004).

### III. Analysis

The issue before the court must be framed narrowly.  The court will focus on the question of whether it was necessary for Hundley to leave the Kansas City area in order to receive adequate medical treatment for her severe eating disorder – because this is the consistent and exclusive ground provided for Defendant's denial of Plaintiff's claim.  Whether air ambulance transport was the optimal, or medically necessary, way for her to travel is not the issue to be reviewed by the court; nor is the suitability of Denver Health for treating Hundley's condition, although both these issues are intertwined with our central inquiry.  For the most part, the parties' arguments, and evidence, pertaining to these ancillary issues will be set to the side.

ERISA requires a plan administrator to provide a participant with the "specific reasons" for a claim's denial, and to conduct "a full and fair review" of any subsequent appeal.  29 U.S.C. § 1133.  According to Plaintiff, Defendant failed to fulfill both these obligations.  First, Plaintiff argues, Defendant's various denials lacked specificity because they did not provide evidence of or information about the suitability of the putative 'closer facilities.'  Second, Plaintiff was deprived of a full and fair review of her appeals because the reviewing doctors did not specialize in the treatment of eating disorders.

### A.  Specific reasons for denial

Defendant denied Plaintiff's claims, as well as her appeals, because it determined that the air ambulance transport was not medically necessary as there were other closer hospitals qualified to provide the required treatment.  The facilities listed by the United HealthCare physicians and

8

the independent medical reviewer included the Shawnee Mission Medical Center, where Hundley was hospitalized, as well as St. Luke's Hospital and the Kansas University Medical Center, both in Kansas City.  Plaintiff characterizes the statements of Defendant's reviewers as arbitrary and lacking specificity, because, although they asserted that the Kansas facilities could have provided Hundley with appropriate care, they failed to provide documentary proof to support their assertions.

Plaintiff argues that the level of specialized treatment that Hundley required was not available at the Kansas hospitals.  To support this position, Plaintiff directs the court, beyond the administrative record, to these hospital's websites, which, she asserts, do not advertise eating disorder specialization.  Plaintiff argues that Denver Health offered unparalleled expertise, such that there was no closer hospital to Kansas City that could provide Hundley comparable, or even appropriate, medical care.  She relies on the Letter of Medical Necessity prepared by Denver Health's medical director and submitted by Plaintiff with her first appeal.  Her argument in favor of Denver Health also relies on its website, which, according to Plaintiff, boasted as of January 2020: "[t]here is no other center or facility in the nation equipped to offer the same level of specialized expertise."

The court first addresses Plaintiff's reliance on the hospitals' websites to make her case. When reviewing the plan administrator's decision under an arbitrary and capricious standard, the court must limit its review to the administrative record.  This record comprises "the materials compiled by the administrator in the course of making his decision."  *Hall v. Unum Life Ins. Co. of America*, 300 F.3d 1197, 1201 (10th Cir. 2002); *Sandoval*, 967 F.2d at 380–81.   An administrator's decision may not be characterized as arbitrary for failing to consider evidence that wasn't presented to the administrator at the time of the decision-making.  *Id.*  "In effect, a curtain

falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision." *Id.* For this reason, the court must disregard Plaintiff's references to the hospitals' websites. Although these website addresses were cited in Plaintiff's second appeal (Doc. 19-5 at 9), the court determines that the websites are not part of the administrative record because the citations do not link to data that was contemporaneous with the administrator's review. Instead, they simply bring the web researcher to the present-day websites for the hospitals. Consequently, there is no assurance that a link suggested by the Plaintiff at the time the appeal was drafted was the same link that was viewed by the plan administrator in reviewing the appeal; nor is the link likely to connect to the same material that the court would access if it were to search the web at the time of this writing. Moreover, these websites are part of the hospitals' promotional and marketing materials and should not be interpreted as representing a comprehensive catalog of routine services that a hospital provides.

With or without the information included on the websites, Plaintiff is in the difficult position of having to prove a negative. Defendant states the Kansas hospitals, including the hospital where Hundley was hospitalized before the transfer, could have provided the necessary care, but Defendant provides no documentary evidence to support its repeated assertions. On her side, Plaintiff argues that the Kansas hospitals were not equipped to treat Hundley and that Denver Health was the best hospital to treat her condition. However, she also offers very little in the way of proof to support her position. In the case of a draw, the deferential standard of review favors the plan administrator. The burden is on Plaintiff to prove her claim, and, further, it is her burden to prove that Defendant's determination was arbitrary and capricious. *Morales-Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 700 (1st Cir. 2007); *Miller v. Monumental Life Ins. Co.*, 761 F.

Supp. 2d 1123, 1135 (D.N.M. 2009); *see also Allison v. UNUM Life Ins. Co. of America*, 381 F.3d 1015, 1023–24 (10th Cir. 2004); *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008).  As long as the plan administrator's interpretation is reasonable, doubts will be resolved in favor of the administrator.  *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003).

Beyond her website argument, Plaintiff also cites the American Psychiatric Association Practice Guideline for the Treatment of Patients With Eating Disorders (Doc. 19-5 at 234–50) to show that the Kansas hospitals did not offer the specialized treatment that her daughter needed. These guidelines recommend that a patient with an eating disorder be treated by an interdisciplinary team including physicians, psychologists, registered dieticians and social workers.

The medical records reveal that this is precisely the course of treatment that Hundley received at the Shawnee Mission Medical Center.   Its Discharge Summary, which was signed off by the medical directors for the laboratory and radiology departments, reflects contributions from the following additional practices areas:  "Psychiatry"; "Dr. Sabatha, Psychology"; "GI expertise"; "Echo was obtained"; "Nutrition and pharmacy consulted"; "Nephrology consulted"; "Neuropsychiatric testing completed by Dr. Noll"; "Social worker assisting with arrangements." (Doc. 19-5 at 138.)  Furthermore, the summary notes that progress had been made; Hundley was stable, her diet regular, and she was permitted to return to activities as tolerated.  It is apparent from this summary that Shawnee Mission Medical Center was capable of treating a patient such as Hundley utilizing the multidisciplinary approach recommended by the American Psychiatric Association, and had in fact done so during the ten days she had spent there.  The psychiatrist who

performed the independent external review noted that, "Treatment for your acute malnutrition was already underway at the Shawnee Mission Medical Center and could have been continued there." Nothing in the record indicates that this conclusion was arbitrary or unreasonable.

The reviewing psychiatrist also wrote, "Published information from the University of Kansas Hospital in Kansas City, Kansas shows that further treatment for anorexia nervosa was available and would have avoided the increased risk posed by air flight." (Doc. 19-10 at 14.)   This hospital had also been included as a 'closer' alternative in response to Plaintiff's two previous appeals.  While hospitalized at Shawnee Mission, Hundley told staff that she had gone to "the GI Clinic at KUMC" for abdominal pain and constipation but "they have not been able to help her." The records further indicate that Hundley hinted that she had had "Liver bx [biopsy] possibly at KU, pt will not tell me."  Shawnee Mission staff finally obtained the records from the University of Kansas Hospital, and noted, "KUMC records reviewed, multiple visits for c/o constipation. Weight loss documented throughout records."  (Doc. 19-1 at 322, 328, 335.)

There is no evidence that Hundley ever sought treatment for her eating disorder at the University of Kansas Hospital.  Furthermore, the fact that she was treated but not 'cured' at the University of Kansas Hospital does not in any way establish that the Hospital was not equipped to treat her.  There is ample evidence that Hundley refused to acknowledge that she had an eating disorder, and that she was extremely resistant to medical intervention.  Plaintiff also voiced frustration at the Shawnee Mission staff's inability to help her daughter.  (Doc. 19-1 at 378–84.) In fact, it is apparent from the record that little progress could be made in treating Hundley's eating disorder until her mother was appointed legal guardian to make medical decisions on her daughter's behalf.  All these issues may have interfered with Plaintiff's ability to make an accurate assessment of the services available at the Kansas City hospitals.  Certainly, there is nothing in the

record that supports a determination that Defendant was arbitrary or unreasonable when it concluded that the University of Kansas Hospital was qualified to provide Hundley with the medical care she needed.

Plaintiff seems to have concluded that Denver Health would be the best facility for her daughter.  As the independent medical examiner described it: "The decision to travel from Kansas to Colorado for treatment appears to have been an elective decision, not a medically necessary decision."  While the decision of a parent to seek the best for a child is natural, this is not the same criterion that a plan administrator must employ when making decisions about the allocation of shared and limited resources.  Plaintiff's preference does not create a medical necessity.  *See Estate of Larrimer v. Med. Mut. of Ohio*, 6-cv-0920, 2009 WL 1473981 (S.D. Ohio May 27, 2009); *Murphy v. Sec. of Health and Human Serv.*, 62 F. Supp. 2d 1104, 1107–8 (S.D.N.Y. 1999).  The Kansas hospitals need not be Plaintiff's first choice; nor do they even need to be the best treatment choice.  They only need to be equipped to provide Hundley with the care she needed.  The assessment of Defendant's reviewers that the three Kansas hospitals were qualified to provide Hundley with experienced and competent care, without the further stress of transporting her to another state, was reasonable, and bears no hallmark of caprice or arbitrariness.

### B.  Full and fair review

Plaintiff argues that Defendant's benefits denial was arbitrary because the physicians who rendered the decisions were not specialists in eating disorders, but instead were a family practitioner and two internists.  Because her claim was reviewed by doctors who did not specialize in eating disorders, she did not receive the "full and fair review" required by ERISA.

A full and fair review requires "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the

decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Sandoval*, 967 F.2d at 382 (internal quotations and citations omitted); *see Mary D. v. Anthem Blue Cross Blue Shield*, 778 Fed. App'x 580, 589 (10th Cir. 2019).  According to the regulations promulgated for the administration of ERISA plans, a "full and fair review" requires that the plan administrator "consult with a health care professional who has the appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii).

When Plaintiff sought an independent external review, after her appeals had been denied, she requested that the files be reviewed by a psychiatrist because she thought a psychiatrist would have the best understanding of her daughter's condition.  However, Hundley's most pressing problem at the time of her hospitalization was severe malnutrition and resulting complications. Furthermore, the evidence Plaintiff presented from the American Psychiatric Association guidelines for ongoing treatment of anorexia nervosa recommends a multidisciplinary approach. Consequently, the court concludes that it was reasonable for Defendant to have the earlier reviews conducted by a family practitioner and two internists, all of whom are trained to consider the full and complete needs of a patient.

Plaintiff also objects that the doctors whose reports she presented were not afforded adequate weight.  Plaintiff submitted the Letter of Medical Necessity from Denver Health's medical director, Dr. Mascolo, with her first appeal.  With her second appeal, she submitted the report of Dr. Ashraf Ali.  Both appeal denial letters, as well as the report of the independent examiner, include assurances that all supporting materials were fully reviewed.  (Doc. 19-5 at 1; Doc. 19-6 at 139; Doc. 19-10 at 15.)  This is sufficient.  Defendant is required by the regulations to review Plaintiff's submissions and to take them "into account"; however, it is not required to

address them. *Mary D.*, 778 Fed. App'x at 589; 29 C.F.R. § 2560.503-1(h)(2)(iv).  The Supreme
Court has determined that no special weight need be given to the opinions of treating physicians
in ERISA cases. *Black & Decker Dis. Plan v. Nord*, 538 U.S. 822, 830–34 (2003) ("Nothing in
the Act itself, however, suggests that plan administrators must accord special deference to the
opinions of treating physicians.  Nor does the Act impose a heightened burden of explanation on
administrators when they reject a treating physician's opinion.")  Besides, there is nothing in the
record to indicate that either Dr. Mascolo or Dr. Ali ever actually treated Hundley.  Dr. Mascolo's
letter describes the program available at Denver Health, and summarizes the medical records from
Shawnee Mission Hospital and the notes provided by Angel MedFlight.  She does not reference
any treatment notes from Hundley's time at Denver Health; nor does she make any assessment of
the Kansas hospitals.  (Doc. 19-5 at 111–12.)  Dr. Ali states in his Independent Medical Review
that he reviewed Hundley's medical records.  (Doc. 19-6 at 120.)  He compares the merits of air
ambulance transportation to other modes of transport for a patient in Hundley's condition.  As for
the issue of which hospital was capable of providing the necessary care, he states that, due to her
condition, "it was felt in the patient's best interest to transfer her to the specialized facility."

Consequently, the court concludes that it was reasonable to have Plaintiff's appeals
reviewed by a family practitioner and two doctors of internal medicine, and that the weight
accorded Plaintiff's medical submissions was proper.  The court holds that Plaintiff received a full
and fair review of her ERISA claim and the ensuing appeals.  The court holds also that the reasons
for Defendant's denials were sufficiently specific, communicated adequately to Plaintiff and were
reasonable.  Defendant's procedures were appropriate and were not arbitrary or unreasonable.

**IV.  Conclusion**

For the reasons stated above, Plaintiff's motion for summary judgment is DENIED (Doc. 14), and Defendant's motion for summary judgement is GRANTED (Doc. 22).

IT IS SO ORDERED this 15th day of May, 2020.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE